The first case this morning is Aregood, et al. v. Givaudan Flavors Corporation. Mr. McClain. May it please the court. I'm Kenneth McClain and I'm here on behalf of a group of workers from the ConAgra plant in Rensselaer, Indiana, who were injured by the inhalation of a chemical called diacetyl, which was commonly used in butter flavors before about 2007. This diacetyl was found in the butter flavor supplied by appellant Givaudan. This case was dismissed by the district court, and we believe that that dismissal should be reversed and remanded for trial. Many legal as well as too many factual issues to address remain unresolved and were resolved in defendant's favor when, in fact, evidence was available to find sufficient issue to go to the jury. This case brings to the fore the conflict between the sophisticated user doctrine and the federal scheme of warning provided by OSHA under C.F.R. 1910-12, so called the OSHA Hazard Communication Act. Under that act, every chemical manufacturer in the country must, it's not optional, must supply material safety data sheets with their product which outline the dangers and what precautions must be taken with those products. In addition, that rule requires every employer of someone that is using such materials to supply those to their employers by placing them at locations throughout their workplace where they are readily available. This rule supplies the duty in this case and went virtually unexamined by the court below. It is virtually not addressed by the defendant in this case, and yet in many other circumstances, including the case that we cite to you from the Northern District of Iowa, where this issue was squarely presented to Judge Mark Bennett, he addressed it and in our reply brief at page 9 had this to say about the conflict between the so-called sophisticated user doctrine and the federal regulation. As he said, the duty of a chemical manufacturer such as Givodon to provide complete and accurate MSDSs to their customers that identify the hazards posed as well as the necessary safety equipment to be utilized is not a rare oddity of Michigan law, but is instead mandated by federal law. The same law expressly permits employers like ConAgra to rely on these MSDSs rather than conducting independent research on the chemicals they purchase. Is this, you're referring to 129 CFR 1910.1200? Yes, sir. Yes, so this has been raised on a number of occasions. I wonder if perhaps you could be a bit more precise. My understanding is you think there's a genuine issue of triable fact. I do. On the issue of the sophisticated user. I do, Judge. Could you tell us precisely what you think those user doctrine so-called applies in this instance? You have to establish as the first point that the manufacturer sells the product to an intermediary with knowledge or sophistication equal to that of the manufacturer. This we believe that the court got wrong below by simply equating the size of ConAgra with the size of Givodon and said therefore they are sophisticated manufacturers. No one was as sophisticated as Givodon in regard to this issue. They were the first company who had an outbreak of bronchiolitis obliterans in their own plant in 1992 and they employed a team of toxicologists and doctors to investigate what the source of that disease outbreak was and what they determined was that there were only three chemicals that were possible. One of those was diacetyl. They stopped the research and we attach this in our appendix. This is appendix .063. Simply because they didn't want to know precisely what chemical it was so they would not have a duty to warn. Judge Bennett in the previous case that I cited you called that willful blindness but they knew diacetyl was involved and in fact put in precautions in their own plant beginning in 1992 about this very danger. They studied it after that point in time and when another outbreak occurred in 2001 they in fact were relied upon by the Flavoring and Extract Manufacturers Associations as the expert in this area on the outbreak of bronchiolitis obliterans. There is no such history for ConAgra in regard to this issue and therefore the first test is not met. ConAgra was a stranger to this issue. They read about an outbreak of bronchiolitis obliterans in a popcorn plant using a flavor and they believed as other members of the popcorn manufacturing industry did that it was a unique circumstance to that plant. And as I understand it there's no evidence that ConAgra knew the amount of this stuff that was in the product. That's right and in fact in Jividan's as a trade secret and never even told them that diacetyl was contained in their product and at the very time there were diacetyl free products and that is what in fact ConAgra believed about Jividan's product and they switched from the product that was implicated in the studies that were coming out in 2001 to Jividan's product so much so that Jividan's product was the 90% supplier of diacetyl to the plant when my workers worked there. They did that specifically because Jividan did not contain the warnings of the other products. They thought it was safer and used it as such. So the first test we believe that presents tribal issues of fact as to whether or not ConAgra was in fact a sophisticated user in the sense that the cases discuss it. Likewise I think that the issue about whether or not the manufacturer adequately warned this intermediary it needs to be examined by a trial on the facts. Jividan says it's irrelevant that they didn't warn. They agree that their material safety data sheet was deficient compared to all others. They say that that is the answer though that all other products warned about this danger theirs didn't and therefore we were warned. That puts the test on its head. The reality is that by not warning they gave ConAgra the false assurance that their product was different. They argue that every product on the defect claim is different and therefore you can't compare one with the other. They can't have it both ways. If in fact their product was dangerous they needed to warn about it and we say that it was and did cause these diseases. The third tribal issue your honor that I believe we we had a right to have a trial on is that the manufacturer in this instance could reasonably rely on the intermediary to warn the ultimate consumer. In this case of course we made an argument that that probably will not be the focus but we said that under the Kroger case an Indiana case we're not an ultimate consumer and so the consumer expectation I mean the sophisticated user defense shouldn't apply. I'm leaving that argument to the briefs and you can you can review that but in this regard how could how could the manufacturer rely upon ConAgra to warn when in fact they were not warned and believed and the testimony was they believed that Jividan's product was not dangerous like the one that was being used in in Missouri. So we have a factual issue about whether they did warn whether ConAgra was adequately warned but it was absolutely clear that ConAgra gave assurances to their employees that they were following all directions of the manufacturers and that their situation was different because of the difference in products and also because they were using different ventilation and they were using a closed system so they were not adequately warned to protect my clients in this instance. The district court pointed out that your opponent's position is that they made took these put it in place all of these procedures months before they discovered any of their What's your answer to that? Judge I Mr. Hochstrasser discusses some of the procedures that were in place but the evidence was and we presented that beginning in 1992 they began using a closed system when working with diacetyl that all the employees within their own plant were required that is Jividan's plant to use a respirator when working around diacetyl and this is these instructions were not given in their material safety data sheet and so while they did continue to place more and more restrictions and requirements they did not even give the basic precautionary language to ConAgra to know that what they were working with was a danger. Even more fundamentally Hochstrasser testified he really didn't know the date well it was all implemented right? Well that's a disputed issue Hochstrasser admits. That's my point. Yes it's a disputed issue it's a disputed issue and should have been tried we say and Judge Bennett I hate to keep coming back to him but he did try one of these cases to conclusion concluded that the only reason that they can make this claim about their lack of knowledge was willful blindness and stopping the study so they wouldn't have to So we believe that Jividan had all the knowledge that they needed to warn if they had told us what they were doing in their own plant it would have been very helpful to ConAgra. ConAgra in fact switched after Jividan gave them a warning in 2007 to a diacetyl free product which they had available from 1991. They had an equivalent substitute product that worked just as well that did not contain this offending chemical. So we believe that there are tribal issues. There was no difference in the cost. They switched it out precisely at the same cost they were supplying it to ConAgra in 2007. So and it's still the product they're using today as far as I know. So so if you've eaten Orville Redenbacher popcorn lately and didn't notice a difference between 2007 and today then then you know what I'm saying. The product is the same it has the same utility and that takes me to this last point on defect. We had a tribal case on defect here that we believed should have survived summary judgment. The first test for the defective product is that it's a condition not contemplated by the expected user and it's unreasonably dangerous when used as expected. Nobody expects butter flavor to cause you know serious and potentially fatal lung disease. So that test was easily met. A manufacturer is liable for defective products when they fail to exercise reasonable care under their circumstance and this is under Indiana law a little bit tricky because this involves a balancing test that the jury must believe that the extent and frequency of the harm outweighs any burden of an alternative design and you know there's one case the Phillips case that analyzes the frequency idea that was the case where they were the they had the tipping cabinets and the cabinets tipped and injured children and and they brought a defect claim and they presented 73 cases. The court said that's enough cases for us to be convinced it's dangerous. In this case we had testimony from the very doctors that that discovered this that examined the ConAgra plants and they said that there were hundreds of cases in the ConAgra plants alone. So that test we believe was met. Well how did you really come up with a reasonable alternative on the design defect issue? Well judge I think so because they actually used the product that ConAgra that Jividan offered that didn't didn't have diacetyl in it and that was the testimony from their own flavorist that they had this product beginning in 1991 and in fact that is what replaced the diacetyl product because it's no longer being used and it hasn't been used since 2007. So and we gave we gave memorandums and letters and they're in our appendix which say that these are the absolute equivalent of our diacetyl containing products. So yes I believe so I think it's an admission of the appellant in this instance and therefore at least presented a triable issue of fact on this issue and and therefore we're we're tribal issues of fact on all these points and I think that my clients deserve to trial and that's what we would ask the court to allow us to proceed with if we are fortunate enough to be remanded back to the district court and I'll reserve the remainder of my time for rebuttal. Thank you May it please the court, Kim Raimondo on behalf of Appalachia Jividan Flavors Corporation. The district court's decisions to grant summary judgment in this case should be affirmed first because the overwhelming undisputed evidence is that ConAgra was a sophisticated intermediary of butter flavors containing diacetyl. On the design defect claim appellants presented no expert testimony of a design defect. They presented no evidence that Jividan was negligent in designing its butter flavors and the any alleged defect was not the proximate cause of the appellants injuries and finally the negligence claim is subsumed by the Indiana Product Liability Act. Ms. Raimondo you I guess a good place to start would be on the sophisticated user issue and the Indiana courts said this is usually a fact for the finder of fact issue for the finder of fact. Why is your case so exceptional that it really doesn't fit into that normal pattern? Your brother has indicated that there are genuine issues. Why aren't they genuine issues? Why is this case so different? I know that sophisticated intermediary can involve questions of fact. Rare cases do occur and this court has held summary judgment as appropriate in sophisticated intermediary cases in appropriate circumstances. For example the Taylor versus Monsanto case, the Eurocopter case. Both of those cases summary judgment was granted on sophisticated intermediary grounds and if there was ever a case that was appropriate for summary judgment on sophisticated intermediary it is this case because ConAgra is the textbook example of a sophisticated intermediary. Did they know about the fact that you were using respirators for your people? Now this is why I was preparing to address the questions of fact that Mr. McClain mentioned. There are events because the events relating to ConAgra and their knowledge about butter flavors containing diacetyl are undisputed. The events that you're referencing, the procedures relate to the use of diacetyl, the actual raw ingredient in a tastemaker's plant in the 1990s. The raw ingredient diacetyl is different from butter flavors containing a percentage of diacetyl. How does the plaintiff know about that? How does the plaintiff know about? The difference. Well they're different products. Well, different products? Let's take another example. Acetic acid and vinegar. Acetic acid is a corrosive substance that can cause lung disease and lung damage and in certain circumstances it requires the use of a respirator. Acetic acid is the primary ingredient in the vinegar that you use in your kitchen. So while respirators may often be required around acetic acid, there has never been a suggestion that respirators are required when people are using vinegar to cook in their kitchens. So the behavior of a product in its raw form does not translate to a completely different product that may contain that ingredient as a small percentage. So as a sophisticated intermediary, they would know that, right? They would know about butter flavors. As a sophisticated intermediary, what did ConAgra know about butter flavors containing diacetyl? Did it know the quantity of this substance that was in the product you're selling? ConAgra has known that diacetyl, the evidence is undisputed, ConAgra has known that diacetyl is an ingredient in butter flavors since the early 1990s. It has known the, in fact, the evidence is that ConAgra is the one that would specify, turn it up, reduce it, because they knew that diacetyl is the ingredient that gave the buttery... Did they know the quantity? It's unclear whether they knew the exact amount of diacetyl. NIOSH will tell you, if a butter flavor contains diacetyl, period, it can cause bronchiolitis obliterans. This new argument that they have raised about... ConAgra didn't know the percentage of diacetyl is a new argument that has never been raised until this appeal, but also it contradicts the science. NIOSH says, if your butter flavor contains diacetyl, it therefore is hazardous and you need to protect your workers. It doesn't say, does your diet, does your butter flavor contain X amount of diacetyl or Y amount? It's the diacetyl in it, period, is all that is required from NIOSH's perspective. And you protected your workers after it was modified? I'm sorry? When did you start protecting your workers with your respirator? So this is going to Judge Ripple's question earlier, the timeline. The answer to your question, Your Honor, is clear on the face of the documents. In August 13, 1992, Tastemaker instituted operational procedures for diacetyl in its plant. And the undisputed testimony is that it was because it irritated eyes. That is at docket 466-12. If we have documentation on the issue, why did the district court rely so heavily on this deposition of Mr. Hochstrassman? In what way? With respect to when you introduced the... Because the timeline is, the procedures went into... You didn't cite the documents, you cited the dep... He cited the deposition discussing these documents in the timeline. So those operational procedures went into effect in August of 1992. November of 1992 is when Tastemaker received a letter from the coroner about a former employee that had passed away and the coroner was trying to figure out what was the cause of her death. And then in December of 1992, Tastemaker learned of two other instances of respiratory illness. So this is part of the reason why Judge McKinney, in evaluating the evidence as a whole, concluded that the plaintiff's interpretation... The inferences that they seek from the facts are unreasonable as a matter of law and that their facts stretch too far from the evidence presented. The undisputed evidence is that Givadon started supplying butter flavors containing diacetyl to this plant in 2001. We set forth in the briefing a multitude of undisputed facts about ConAgra's knowledge about butter flavors. And Judge McKinney recounted those facts in detail in his opinion. But there are five facts by themselves that occurred in 2001 that are undisputed that show ConAgra's knowledge. First fact, they knew NIOSH had done an investigation in Jasper, Missouri, and that former workers developed bronchiolitis obliterans, which is the disease that the appellants claim, and that it was linked to butter flavors that were used in that plant, which is the product they're complaining about. Second fact, NIOSH actually contacted ConAgra and sought their help in investigating the link between butter flavors containing diacetyl and bronchiolitis obliterans in popcorn workers. NIOSH came to ConAgra's plants and actually measured diacetyl and lung function in ConAgra's plants, and that's also in 2001. Third, they had a Wall Street Journal article that they distributed to all of their employees that notified them about the investigation that took place in Missouri, that the former employees of that Jasper plant had developed bronchiolitis obliterans, and that NIOSH suspected butter flavors, and then recommended reducing exposures to the employees. Fourth, ConAgra began working with its own trade association in 2001 regarding this very issue of whether butter flavors could cause bronchiolitis obliterans in popcorn workers. They had NIOSH come to their meetings and explain the results of their findings to their popcorn industry. Jevenon was not a member of this trade association. The popcorn board, ConAgra, says, well, the cat's out of the bag. The industry needs to work with NIOSH to try to determine how to reduce employee exposures to butter flavors with diacetyl. And ConAgra, along with other popcorn manufacturers, started developing policies in 2001 for respirator use around butter flavors and how to minimize employee exposures. Those are the material facts. The facts that relate to this tale of events that took place in a separate plant of a flavoring manufacturer, one of Jevenon's predecessors in the 1990s, they are not material. And the inferences that the appellants seek from the facts related to that are unreasonable. And Judge McKinney was proper to find, as a matter of law, that the tastemaker investigation, that the inferences that appellants sought were unreasonable as a matter of law, and that the overwhelming undisputed evidence about ConAgra's knowledge about butter flavors was sufficient grounds to grant summary judgment with ConAgra as a sophisticated intermediary as a matter of law. Appellants do not dispute the facts about ConAgra's knowledge of butter flavors beginning in 2001 when Jevenon was shipping to that plant. There is no dispute. And because there is no dispute, that is why they try to distract from those undisputed facts by pointing to tastemaker's investigation in the 1990s. But that, even if you assume that their version of events of the 1990s is true, it does not change the fact that Judge McKinney was correct when he concluded that ConAgra, as a matter of law, is a sophisticated intermediary because it is undisputed that when ConAgra, that when Jevenon shipped butter flavors to ConAgra's plant, ConAgra was fully knowledgeable from multiple sources about the alleged link between butter flavors containing diacetyl and bronchiolitis obliterans, the product and disease at issue in this case. When did you start using the respirator in your plant? The procedures, the operational procedures in tastemaker's plant regarding raw diacetyl went into effect in August of 1992. And the employees, the undisputed testimony is that they were not required to wear respirators around mixtures containing diacetyl, including butter flavors. That respirators were only required around the raw, unadulterated, pure substance diacetyl, not butter flavors containing diacetyl. And when appellants try to compare requirements with respect to the raw ingredient and requirements with respect to a mixture that contains that raw ingredient as a diluted portion, they are comparing apples to oranges. What the procedures are with respect to a raw chemical, just like the acetic acid and vinegar example, you have to wear a respirator with acetic acid, but you are not wearing respirators in your kitchen when you're cooking vinegar. Your brother mentioned during his oral argument that there were certain studies done by your client that never came to completion and there was some question as to whether the company allowed the scientists to follow their regular protocols. Can you tell us your view of that situation? I would be happy to do that, Your Honor. And again, his comments relate to Tastemaker's investigation of respiratory illness in its plant in the 1990s. So perhaps one background fact may help put this in context. Givadon is in the middle of a supply chain. They buy raw ingredients from suppliers and they use those raw ingredients in their plant to mix them together to make flavors to sell to food manufacturers like ConAgra. Diacetyl was one of the ingredients that Givadon or Tastemaker purchased. They didn't manufacture diacetyl and they were entitled to rely on their diacetyl supplier's warnings with respect to diacetyl. Givadon takes diacetyl, mixes it up, and then they sell a finished product, a mixture, to ConAgra. So the investigation, what happened at Tastemaker in the 1990s is we start with this letter in 1992 that a former employee passed away. In December of 1992, two other instances of respiratory illness were discovered. Tastemaker immediately put together a task force. They investigated, they started researching, they hired outside consultants to determine what was the cause of the problem. If these people were developing illness because of the plant, and if so, which raw ingredient was it? The investigation related only to raw ingredients, not mixtures that were sold to customers, because this is what Tastemaker employees worked with. So they hired outside consultants who told them, there is nothing in your plant that is a known cause of bronchiolitis obliterans. So we don't know what is the cause of the respiratory illness in the plant. One expert, Dr. Brooks, told them there was nothing in the plant that was a known cause, but he would suspect gum arabic and enzymes. Another expert told them he thought that the problem was actually caused by acetaldehyde, which is a chemical that is unrelated to diacetyl and it's not in butter flavors. So this, over this investigation, took place over a period of five or six years. And at the, they hired epidemiologists, occupational medicine doctors, the gamut. This is a company who was taking steps to do the right thing, to try to determine if there was something that was causing illness, and if so, what was the cause? Toward the end of 1996, Dr. Locky, the one who had told them that he thought acetaldehyde was the cause, said that Tastemaker could do an epidemiology study, but they used thousands of raw ingredients. They didn't just use diacetyl, they used thousands of ingredients in their plant. And he said an epidemiology study to try to rule out each chemical one by one could take years. And meanwhile, people could continue to get sick. Alternatively, Tastemaker, you can improve the ventilation in your plant and just simply eliminate all exposures so that you solve the problem, which is a perfectly reasonable, acceptable approach. And that was what was recommended by Dr. Locky. So, taking his recommendation, Tastemaker improved the ventilation throughout its plant, it isolated acetaldehyde into its own room, and then there were no further issues. So, these events, I will caveat by saying, again, that these events have nothing to do with what ConAgra knew about butter flavors, beginning at the time that Givadon started shipping to the plant. But when the evidence is construed as a whole, and what I just explained the events were, it is easy to understand how Judge McKinney concluded that the appellant's inferences from the evidence relating to that investigation are simply unreasonable. And this case, or this court, I'm sorry, recognized in the Taylor v. Monsanto case expressly that taking documents out of context cannot create a genuine issue of material fact, and that a plaintiff's interpretation of documents can be unreasonable as a matter of law. And that is exactly what Judge McKinney concluded here with respect to the Tastemaker investigation of raw ingredients. And then we get to 2001, and the world learns of NIOSH's investigation of this popcorn plant. Givadon was not a popcorn plant, and didn't manufacture microwave popcorn. And NIOSH concludes, hey, there are these people that had bronchiolitis obliterans, and we think it's butter flavors that contain diacetyl. And ConAgra knew about that when it happened. So there is no evidence that Tastemaker or Givadon ever, prior to the time ConAgra learned, had any greater knowledge about butter flavors than ConAgra did. And this is why Judge McKinney's opinion is fully supported by the undisputed facts on the sophisticated intermediary. Appellants argue, I think there was a question earlier about the adequacy of the warning, and I can't remember the specific question. This Stoltz case that Mr. McClain mentioned, Judge Bennett and the Northern District of Iowa found, as a matter of law, on these exact same facts that have been presented to this court today, that ConAgra is a sophisticated intermediary of butter flavors containing diacetyl. The facts that were presented to Judge Bennett, Givadon was not a party to that motion, but the facts that were presented to Judge Bennett and the facts that he outlined in his decision, in the Stoltz decision, were exactly the facts that we have included in our briefs. And he concluded, as a matter of law, ConAgra was a sophisticated intermediary. However, he did not grant summary judgment because there was a question of fact on the adequacy of international flavors and fragrances warning, which Michigan law required, in addition to the sophisticated intermediary. Here, Indiana law is clear that if the intermediary has knowledge, the adequacy of the warning is irrelevant to the analysis. In the Eurocopter case, in which this court affirmed a summary judgment, there was no warning given. It was undisputed, there was no warning at all given. Yet, the intermediary pilots were found to be sophisticated. And the same result should occur here. The overwhelming undisputed evidence shows that ConAgra was sophisticated. It is appropriate when the... Well, I wouldn't call it overwhelming. Well, I think there are more than 40 or so undisputed facts outlined in the briefing and the opinions. And I just highlighted the five that took place. What did ConAgra know about your determination that it was only after the test you ran to determine that it was okay when it was changed, when the product was changed? I'm sorry. I'm out of time. But I'm not sure I understand your question. You had an expert make an examination, made a determination. When you started just saying, well, only use respirators in certain areas where that's concentrated and not in the rest of the plant because of... ConAgra, the MSCS that was attached in the appellant's appendix from Givadon for the butter flavor, specifically said, respirators are not normally required, but if you're using this product in a confined space or a space where there is not adequate ventilation, use a respirator. And when was that given to ConAgra? Throughout the entire time period. I believe the MSDS that they attached was from 2000, which is before Givadon ever started supplying to the plant. And it is for the... The employer is the only one who knows what the ventilation is, what the engineering controls are, how the products used in the plant. They have sole control of their employees. So it's for the employer to determine whether their ventilation is adequate or whether they're working in a confined space. So the MSDS that is in the appendix to the appellant's brief, which all of the MSDSs said, if you are using this product in a space that is confined or not well-ventilated, respiratory protection is recommended. And that's then for ConAgra to evaluate in the light of its circumstances and determine whether respirators are required for their employees. But in 2001, when Givadon started supplying to that plant, ConAgra was part of the team who developed respirator requirements for butter flavors containing diacetyl. So regardless of what was on Givadon's MSDSs, ConAgra had information from a multitude of other sources that were telling it to evaluate the employee exposures and, if necessary, put them in respirators. And they instituted a mandatory respirator policy for their mixing room employees. So as the employer, ConAgra can't turn a blind eye to all of the information that is in the public domain telling them, hey, butter flavors containing diacetyl may cause bronchiolitis obliterans. Use respirators. When did your company start using the respirators? They did not ever use respirators for butter flavors, which is the product that was sold to ConAgra. When did they start using the respirators for this product? Well, the product at issue is butter flavors, where diacetyl is just an ingredient. Well, my question to you was not that. Answer my question. Well, I just wanted to make sure which product we're talking about. The product diacetyl, the operational procedures that I cited, docket 466-12, are dated August 13, 1992. And it required around raw diacetyl respirators. And when did you notify ConAgra of that? Well, the manufacturer doesn't – they – I understand what you're saying about their association developed this thing that said there may be a problem with this. Well, I guess what I'm struggling with, Your Honor, is that Givodon did not sell raw diacetyl to ConAgra. Givodon sold butter flavors to ConAgra, and that – so they warned if the respirator – How much? How much? Percentage. Of diacetyl? Yeah. Some of it was less than 1 percent, some of it was over 1 percent. I mean, it varied by the formula. So why didn't you just tell them that we're using it when it's diluted? We didn't. Tastemaker did not use respirators when diacetyl was diluted in mixtures in its plant. So the information that Tastemaker was giving to ConAgra was consistent with its own procedures in its plant. It didn't wear respirator – it did not require respirator use around butter flavors containing diacetyl. Let me get back. When did you start using it? I know I'm not talking about butter. I'm just talking about the chemical. When did we start using the chemical? The respirators – it's August 1992, operational procedures, 466-12. That is when Tastemaker employees were required to wear respirators when using raw diacetyl. All right. And I don't think there's any evidence. And you determined that information was not necessary to provide to ConAgra because you didn't provide them with the 100 percent diacetyl or whatever it was. Right. Well, the warnings that were provided to ConAgra were provided in accordance with the hazard communication standard, and the standard says that for a mixture, the manufacturer of the mixture is entitled to rely on the information from the suppliers. The supplier information said vapor is irritating the throat and lungs, and the suppliers of diacetyl were not telling Givodon to wear respirators. You have to take it in context of the reason that the operational procedures were put into place was because of eye irritation. The employees were complaining about their eyes, and that evidence is undisputed. So there was no determined—diacetyl, by the way, was not just used in butter flavors provided to ConAgra. It's in thousands of products, and the company was making mixtures. They weren't selling the raw ingredient. So what would they tell people? Our people have eye irritation, so we've put them in masks. The MSDS says vapor is irritating to the eyes, vapor is irritating to the throat and lungs. All the diacetyl causes problems under certain circumstances of less than 100%. The MSDSs said what was known about diacetyl at the time, which is that it was irritating to the throat and lungs and irritating to the skin and eyes, and that is the information that was known at the time, and that is the information that was on MSDSs for butter flavor containing diacetyl that were sent to ConAgra. Then the MSDS you provided with the butter-flavoring product did not disclose diacetyl as an ingredient. MSDSs typically do not disclose ingredients as ingredients unless they're carcinogenic, which is not an issue in this case, and there are trade secret—the hazard communications— That's what we're getting to then, trade secret, right? No, it's just that that is not the case. You ordinarily—a flavor company, its entire business is the formulas for its flavors, and there are no MSDSs anywhere where a manufacturer lists every ingredient on its MSDS. That is not the purpose. The purpose is to warn of known health hazards relating to the product, the mixture, that is being sold. You know, the process we've just gone through, you and I, doesn't make this really overwhelming on your side, does it? Respectfully, Your Honor, I think that it is overwhelming because I think that we're mixing apples and oranges. Diacetyl as a raw ingredient is one product. Butter flavors are a different product, and the issue is what does ConAgra know about butter flavors at the time Givadon started selling to that plant, and it knew everything that Givadon knew. There is not one single piece of paper in the record or anywhere from the 1990s or otherwise where a tastemaker even suspected butter flavors being the cause of illness in its plant. So I am well over my time. Thank you, Your Honor. We'll give you time. I'll be giving counsel some additional time when you finish. Okay, thank you, Judge. Counsel has made an advocate's argument on facts that are disputed at every stage. The idea that they didn't know that diacetyl was an issue is hotly disputed. It wasn't that they were—they went through a very complicated process. We put the grid in where they took all the chemicals in the plant, and they compared them on three criteria in terms of where disease had been found in their own plant and in another study that was done in Indiana as well, an Indiana Baker study in 1992 that had been done by NIOSH, and they narrowed it down on this grid, and we've attached it as part of our appendix. There were only three chemicals at issue, diacetyl, acetaldehyde, and methyl sulfide, three chemicals, and it was based upon the fact that it was down to just those three chemicals, and that's what the scientists, Dr. Locke and Dr. McKay, and we cite their testimony about how frustrated they were that they were not allowed to pin it down. The reason was disclosed in this document that I cited you before, and what it said is this, and it's under the hazard communication standard heading. It says, hazard communication standard, there is no provision in the NIOSH standard that requires the immediate dissemination of information regarding a suspect occupational health hazard. However, if we find that there is a specific health hazard present, that information will have to be shared with the affected and potentially affected employees. So our interpretation of that, and they can dispute it, is that it was determined by them not to proceed to narrow it down to the one chemical at issue because they would have to tell people. I think it's a reasonable interpretation. A jury may not agree with me, but at least I get a trial on that issue, I think. Based upon what I read, the standard is in terms of how the court is to interpret the facts in my favor for the purpose of this motion. So we dispute her recitation of the facts and what they knew and when they knew it, and we do believe that when they said that they utilized respirators working around not only raw diacetyl, but any time it was heated. Heated, and that's the operative term because that's the release mechanism for butter flavors containing diacetyl 2. Once you heat them, the diacetyl is released into the air and that is then the question, is that enough to cause disease? And what's been measured out there at Rensselaer was that NIOSH has determined that under 5 parts per billion, few if any people will get sick. At Rensselaer, using diacetyl coming from the Givedon product, it was 68 to 250 times the level of exposure that NIOSH recommends. So we have a defective product being used at that plant. They have the mechanism and they know the procedures to protect people, that is to use respirators, and yet contrary to what she told you, and we attach this, what they say in the material safety data sheet is in well-ventilated areas, respiratory protection is not normally required. That's what they gave us and ConAgra believed that to be true. We have memos and letters to the employees telling them that, that they were basing their recommendations on what Givedon told them. And they believe that Givedon's product was different. And in fact, Ms. Raimondo's brief says that. She says their products are different than the products used at Jasper. They're all different, she claims, in regard to the product defect claim. But importantly, as was pointed out, they never told us that they even contained diacetyl. And we know from the testimony of their flavorists that from 1991 they had a diacetyl-free butter flavor. So as far as ConAgra knew, there was no diacetyl in this product. There's no testimony that they knew that. They simply understood that whatever the way that this product was made, it was not dangerous like the one in Jasper. At least that's what their testimony is. And I had a right, I think, to have that issue heard by the jury in terms of whether they were a sophisticated user. Because I don't believe in this circumstance they were a sophisticated user as is defined or understood by the law. I had a professor in law school that told me one thing that stood me in good stead. Be careful about the level of generality that your opponent is arguing their case. So you can argue that they're sophisticated simply based upon their size or simply based upon the fact that they were using butter flavors in their plant. But they hadn't been examining this issue since 1992. They hadn't employed an entire team of toxicologists and doctors and other scientists to determine what the risk was. They had, Jividine had a tremendous head start that could have helped everyone and certainly would have been helpful to ConAgra according to ConAgra's testimony in this very case. So we would appreciate the opportunity, as Judge Ripple pointed out, to be in the normal queue of things, to have the sophisticated user defense heard by a jury and not decided by a motion for directed verdict. Or, I'm sorry, for summary judgment. I appreciate your patience with me. My time's up. Thank you very much. Thank you, Counsel. You have five minutes. Thank you, Your Honor. Quickly, ConAgra owned a butter flavor manufacturer in the 1990s, and as such it bought diacetyl from suppliers and used it to make its own butter flavors. They ran tests on their own butter flavors. ConAgra performed studies on their butter flavors in the 1990s, and they knew what the diacetyl percentage was and the use of diacetyl. Again, as we stated in our brief, the investigation that took place at Tastemaker in the 1990s did not have anything to do with butter flavors. It was diacetyl, a raw ingredient, which was used in many, many, many products. The investigation did not give Tastemaker or Givenon any inkling of any suspicion that there was a problem with butter flavors that it was selling to its customers. And Judge McKinney's recitation of the facts regarding ConAgra's knowledge about butter flavors, the undisputed facts, fall squarely within Taylor v. Monsanto and the Eurocopter cases and sophisticated intermediaries. With respect to the design defect claim, there was no question of fact on that claim either. The design of a butter flavor is something that requires specialized knowledge and skill. Expert testimony is required to establish the elements of a design defect claim, and appellants offered none, no expert evidence. And Judge Barker's decision on that point is correct for that reason alone. They tried to get around the lack of expert testimony simply by saying butter flavors were defectively designed just because they contained diacetyl. But that assertion is not sufficient to avoid summary judgment. Their own experts agree that butter flavors containing diacetyl can be used safely. And Indiana law is clear that just because a product may cause injury does not mean it is defective. So if a butter flavor containing diacetyl can be used safely, as their experts admit, it defies logic to conclude that they are defectively designed or unreasonably dangerous. They also produced no evidence at all that Givadon was negligent in designing its butter flavors. At the district court, they presented no evidence, including let alone expert evidence, of the cost and benefits of an alternative design. Instead, they simply argued that, well, there was a diacetyl-free flavor available, and therefore Givadon is negligent. And that is not sufficient to avoid summary judgment. And Judge Barker noted that expert testimony was required, and they offered none. They've tried to get around that on appeal for the first time, trying to give the appearance that there are statistics, and counsel referenced the levels of diacetyl in the air. None of that evidence, to the extent it could even be considered statistical, was presented to the district court in opposition to the motion on design defect, and it can't be considered here. But even so, they offer no evidence on the probability factor. There's no evidence of how many popcorn workers were there at this plant, how many of them worked with butter flavors, how many of them have confirmed diagnoses of bronchiolitis obliterans, and how many of those diagnoses were confirmed to be caused by butter flavors. And they have no evidence of the popcorn population as a whole in the country. How many confirmed diagnoses are there? So they have no evidence on the probability or frequency of the injury. Instead, they make a passing reference to the number of consultations their litigation expert has made over the last 10 years, all of which were in the context of litigation with disputed diagnoses, and that certainly does not rise to the level of the evidence required. They offered zero evidence on the burden, the cost. They simply said the diacetyl-free flavor was no more expensive, with absolutely zero support. It was a conclusory unsupported assertion. And the same with respect to the diacetyl-free formula would have prevented their injuries. They have no expert evidence on that either. It's a conclusory statement. So, in other words, they offered no expert evidence at all that there is a cost-effective alternative design that would have prevented the injury. What did you answer my question when I asked you similar? Did you say that you make a product that doesn't have this diacetyl-free butter flavor? I'm sorry. I misunderstood that if you asked that earlier. They do now. And there was a product in 1990. Because I asked you the difference in cost, and you said they were the same. Oh, there's no evidence. No, that was Mr. McClain, Your Honor, that said that they were the same. You indicated there was no difference in cost between what you're apparently producing now and what you produced then. I don't remember getting that question, Your Honor, and there is no evidence of the cost. There's zero evidence in the record of the cost, and there's zero evidence that a diacetyl-free flavor would have… No, it was my question to you. Okay. Thank you, Your Honor. We'll check the record. Thank you. Thank you. Thanks to both counsel, and the case is taken under advisement.